It is the 4th March, 2010. I'm D.F. Angelic Pallesi. This social security disability case turns on whether the ALJ is properly projected. The opinions of Dr. Gazzetta and Ms. Dr. Pallesi is capable of one to two step instructions that are worth 30 minutes of attention at a time. The state agency physicians that reviewed the record, Dr. Farron and Dr. Goldberg, gazed into their crystal ball and said, Well, by November of 2011, one year after she stopped speeding, this would be better. And she would be able to sustain more activity. We don't have a lot of records in between, but we do have the records from Dr. Blue starting in December of 2011 that described her as significantly impaired, which takes us into, to really scratch out that longitudinal line. We have the records that are, books that were remanned. Opinions of Dr. Rambo that are described by the ALJ on the second application. Opinions of Dr. Cohen on the second application. And the dispersion of Dr. Blue's providing statements from 2011 through 2014. And what's important is that the ALJ on the second application described Dr. Rambo as describing inter-episode remission, which means that on the longitudinal record as being restanded, Dr. Fair and Dr. Goldberg had a basis for projecting improvement, but it was never going to be sustained. It was always going to escape Ms. Plessy's grasp, and she was going to lose it, despite her attempts to comply with medication treatment, which means that Dr. Pizzetto was right. That in the long run, this young lady, after the death of her father and the death of her infant son to SIDS, was never going to have the ability to do more than four to two step instructions, ever more than 30 minutes at a time. And on the record as a whole, with Dr. Blue's opinions in December of 2011, I think that's the ALJ didn't do a good job of projecting Dr. Pizzetto's opinions on that count. And on the motion to remand that's also before the court today, it's pretty clear that that is a fact. And we need to wait and write tests that there is a substantial likelihood that injured police as well are entitled to the SSI that she's getting now, but she's also entitled to a disability insurance benefit, which is qualitatively and quantitatively different. It does have the welfare component restrictions that Title 16 benefits have. On the remand issue, is there any reason you couldn't have gotten Dr. Blue's opinion earlier? On the second application, Dr. Blue, by that time, had three years of experience with Boise, and the regulations in effect at the time of the ALJ decision, the regulations in effect now, tell us that this longitudinal picture that the doctor has is an important weight factor. And I think it's pretty clear from reading what we have in the ALJ decision and the record of the prior application that Dr. Blue's opinions were really informed by that longitudinal experience. Neither I nor Ms. Perales, who was the counsel to the record on the first application, or our office representative on the second application, were able to get that opinion. But I think that it really was informed by that longitudinal picture. And, of course, Dr. Rambo, who described the inter-episodic revision of the psychotic symptoms, that was based on years of experience, starting in 2010 with the death of the child and proceeding forward in time. Sometimes it just takes a lot of experience with a patient to formulate and crystallize those opinions. And so I think courts allow issues to percolate before the Supreme Court decides an issue. And sometimes that's why medical doctors and psychiatrists and psychologists in particular need to allow their experience with this human being to inform them over a long period of time to see what kind of rollercoaster ride they're on mentally and emotionally. I'm not sure you answered her question. Okay. But is Dr. Liu's findings right that you want to remand and have that considered? Weren't those findings available at the time? The 2014 opinion, I don't think, was available. And that's what Dr. Hildegarde Barbeiro discussed in her decision. She was discussing a 2014 opinion that wasn't in existence and was informed by three years of longitudinal treatment. So I don't think that the police used to be charged with having obtained an opinion that didn't exist at that time and probably couldn't have been expressed with the precision that Dr. Liu did in 2014 at that time. It wasn't possible, but it certainly made it practical. And, of course, Dr. Rambo was not treating her, and Dr. Rambo is the one that describes the inter-episodic remission that the ALJ found to be persuasive and consistent with the record. And the most important thing to remember is that the ALJ in the second application, she found disability. That's what the date in the SSI application, which is all they're supposed to do is to sign the SSI application before them. But the ALJ actually credited the police's testimony all the way back to the day after the ALJ decision. I find her credible the day after the prior ALJ decision, which means that the consistent memories, recollection, and story that Angelique Gleasy is telling, the ALJ said, I believe you, but I can't believe you the prior ALJ decision, so I'm going to give it to you. I'm going to find you credible and believable and credit your testimony beginning the day after that ALJ decision. Thank you. If there are no further questions, I will now reserve the opportunity for questions. Elizabeth Fair for the Acting Commissioner of Social Security. What we need to look at is what's in the record here before this ALJ, and my opponent is relying on Dr. Liu who took Liu's opinion from 2014, but let's look at what Dr. Liu said in 2011 and 2012. She is the last treater in the record before this ALJ. In January 2012, she said the claimant had no more depression. That's on page 315 in the record. In March, she also said that the claimant's affect was brighter. In January and March, she described the claimant as being depressed, but her affect was brighter, and all of the mental status examination findings are pretty normal. So that's what's in the record before this ALJ. What happened two years later with the subsequent application is not what this Court should be looking at, and just the fact that it is two years after the ALJ's decision here is pretty significant, and if you compare that to the ALJ decision. That's right. Yes, and those say... But that's in August, but after that you'll notice Dr. Liu diagnosed as major depressive disorder without psychotic features, so that's very different. And also normal cognition, normal thoughts, fully oriented, normal speech, and none of that is consistent with what happened much later. If you look at the way the claimant's describing her symptoms in that second decision, she's talking about major hallucinations, thinking of people in her house. None of that is in the record here. Something happened to this woman later on, but what you have here is the two records that very consistently show normal mental status findings. The district court talked about that, and then you have the state agency physicians who found several repetitive tasks, and if you look at the first page of Dr. Fair's report, it said there's two boxes where he can check current residual functional capacity or full 12 months in advance. He checks current. So that residual functional capacity. Something about in advance, it seems like the ALJ, I thought, misunderstood what Dr. Fair and Dr. Goldberg were saying because they write something about what will happen in the future and the ALJ seems to have interpreted it as in the present. Well, one of the things is the ALJ's decision is after that date. The future, in Dr. Fair's opinion, is November 2011. The ALJ's decision is May 2012, and if you look at what happened between 2011 and 2012, it's those reports that I was talking about where there's all these normal mental status findings. So that's there. I mean, it's still the case that you can't cite Dr. Fair and Dr. Goldberg as having made an assessment that at any given time when they were observing her, or even were observing her, but at any present time, that they were talking about she was already okay, because they weren't saying. I think that's, so why did he check current? I mean, it's a little bit, can you say the degree is 284? Right on the top there, this assessment is for, and it says current evaluation, and then there's an option to check 12 months after onset. So he does check current, and if you go, if we just, I mean, maybe it is a little confusing, and honestly I've never seen a state agency doctor do something like that, but let's look at the record. Why couldn't she perform simple repetitive tasks with limited public contact? How are you interpreting 12 months after onset on this form, and what do you think that means? I think it means that they were looking at, this record has episodes where she's not complying with medication, episodes where she is. And one of the diagnoses she has is bereavement, and so I think they're looking at it and saying, by this time she'll be able to do these tasks. But in this form where the form itself has current evaluation or 12 months after onset, why wouldn't we just interpret that as like the first evaluation or 12 months later? I mean, that doesn't seem to me to really be responsive to what you're talking about, about a prediction versus not a prediction. Okay, well, let's just say that it was a prediction. November 2011. ALJ's decision is May 2012. Look at what happened between November 2011 and the ALJ's decision, and that's where you have Dr. Wu's treatment records that all have relatively, they say depressed or anxious, but all of the mental status examination findings are normal. And then after, in January and March, you have either deeper affect or brighter affect is the way her mood is, depressed or whatever. So those are all consistent with the ability to perform single repetitive tasks. And I'm heartless to find anything in this record that says she can't, but isn't based on a subjective allegation. The ALJ found, the ALJ found the treatment was incredible, fully incredible, and that was never challenged. So what are we left with to say that she can't perform single repetitive tasks? You have that future opinion, but we just talked about that. So then we have Dr. Pizzetta who said that she couldn't handle stress because of the hair issue, alopecia. That's also not supported by anything but claimant and her grandmother's statements, and even if it were true, it's not something that's going to prevent you from performing single repetitive work. So what else is there in this record that says she cannot perform single repetitive tasks? There's nothing that's saying. How about the therapist, Jamie Powers? Didn't she find that she was suffering from significant impairment? I don't think she specifically found limitations. If you look at the first hours she's in, it influences why that November 8, 2012, 2011 date is in there, because that's when she first started dealing with this, Pathways to Recovery. So that first report from Ms. Powers, I think it's from 2045, the Mental Status Examination, she said, ancient and depressed, calm, normal behavior, well-groomed, cooperative, engaging, normal speech, paranoid but no hallucinations, logical, coherent thoughts. Her memory is bad, but she has intact and good judgment, good abstraction, low suicide risk. So that's in, where are you in the record? Page 245. Actually, I'm sorry, it's 253 to 254. So she describes a little bit of paranoia, but those are all pretty normal, pretty favorable findings. So that's when she first treats her. And then in January 2011, Ms. Powers fills out an evaluation that's very different from that treatment record. And the treatment records in between, you have Dr. Gazzetta, November 2010, page 49, in very normal mental status examinations. Same in December. Same in. I heard that Gazzetta was just auto-filled. I mean, there's only a real reason to believe that Gazzetta wasn't actually making that evaluation, including because, you know, one of them was filled out on a day she didn't even attend. Well, that would be assuming that once the doctor's treatment records can't be trusted, and we can't make that assessment. Especially the doctor, I've assessed her on a day that she didn't have an appointment. Where are you talking about? So I think Gazzetta had an evaluation on a no-show day on AR 248 and 301. Well, okay. You can say that those are auto-filled, but he has the option to. So in that case, I think you stop at no-show. But in the other ones, he did see her and he did talk to her, and he has the option of changing those auto-fills. The other things that are inconsistent with the earlier thing, why can't we do struggle at no-show day, that that's just a part of the form he's not really using. Because when she's not showing, he's not going to have any reason to change any of them. When she is there, he would have reason to change them, if he had reason to. So the doctor signed those reports. Those findings are in there. They're all consistent with what the ALJ, with the simple repetitive task residual functional capacity. And the only thing that's not consistent with that, it's just subjective commentary. On Gazzetta, you focused on this thing about stress. If you look at AR 297, Gazzetta talks about trouble concentrating and inability to focus for up to 30 minutes. It's not just about stress. I'm not sure why you're saying that the only finding is about stress. Well, I don't think that being able to maintain attention and concentration for 30 minutes at a time, that's not a disabling limitation. And especially when you're talking about simple repetitive tasks without much public contact, that's not a preclusive limitation. And what was it taking into account in the assessment of the job she could do? Well, I think simple repetitive takes into account someone who's got limitations in concentration. And the ALJ did find moderate limitations in that category of functioning in the decision. So the ALJ is taking all of that into account. So wasn't the ALJ assuming she could do Level 2 reasoning-type jobs and wouldn't central this indication to Level 1? Well, that's an issue that was not briefed and not raised at all. And I don't think it's been decided yet. But if you look at the form that Dr. Gazzetta filled up on page 297 to 298, he had no other option. There was one category that said complex, extensive variety of technical or complex job instructions, and the next one said simple one or two, seven. There's nothing else in there. There's no option for him to have found anything else. He just said, able. Residual functional capacity is not the least someone can do. It's the most someone can do. So assuming that that's less than simple repetitive, the ALJ didn't find that in the residual functional capacity. And I don't think you can take that form as some sort of be-all, end-all to what that doctor thought the claimant could do. And I'm going to say once again, I'm going to go back to the two records where they're all very normal mental status findings. Any questions? Thank you. Thank you. Thank you. I just wanted to answer the question about the preferred evaluation that the host of BARFs that Dr. Fair endorsed. That's preferred evaluation, and it's part three of the mental residual functional capacity assessment. Dr. Fair then gives the estimate that in November of 2011, she'll be able to perform these kinds of simple tasks with women in contact with others. The moderate state agency decision at that time, moderate was defined as if you're being paired. And so we don't know how Dr. Fair would have synthesized all those moderates into a residual functional capacity assessment because that's not what Dr. Fair did. And so the two pieces or breakfast syllables describing one is now, but we don't have a residual functional capacity assessment. We don't have that synthesis. And one is in the future. The other thing is that now it's less decided, but what was clearly briefed is that Dr. Cassata said that she could pay attention for 30 minutes at a time. And paying attention for only 30 minutes at a time isn't consistent with key kind of work activity. It isn't consistent with children in school. It isn't consistent with people in the workplace. Just ask our kids, are you paying attention? And we'll be at the rest of my time. I'm probably still in bed. Thank you, Counselor. Thank you, Mr. Gargan. This is our notice submitted for the sale.
judges: Thomas, Friedland, Carney